Thank you, your honors. May it please the court. My name is Jeff Goodman. I represent the plaintiff, the estate of Nyla Anderson. I'd like to request three minutes for rebuttal. When Congress passed the CDA in 1996, nobody knew exactly where the Internet would take us. But it was clear that this technology would revolutionize the way we all received information. Congress chose to embrace the technology and to support the continued development of the Internet. And it did that in part through this immunity doctrine, correct? Yes, your honor. So let's move, if we could, to the particular technology at issue here and the defect you claim occurred. We're familiar with the facts of the case. We're familiar with the history of the section. Yes, your honor. And in discussing the technology, one thing that I will focus on is what the text of the statute requires regarding maximizing user control in Section 230B. Tell us, though, what is the defect that you claim? Because you have two claims in your case. Yes, your honor. Primarily, product defect, design defect, and failure to warn. Focusing on the design defect component, the complaint uses the word algorithm more than 100 times. Is it the algorithm that you claim is the defective part of this product? And if it's not, what else is there? And that will help us focus our questions. You can't separate the product from the algorithm. The algorithm is the backbone of the product which we claim is defective. The particular defect here is that this algorithm functioned to send this video to a 10-year-old child. We are not claiming that TikTok is responsible merely because the blackout challenge existed on their platform. We are not claiming that this product is defective merely because the blackout challenge was accessible on the platform. We are solely claiming that TikTok's liability, both from a product defect, also there were negligence claims related to the product defect, arises from TikTok sending this challenge to a 10-year-old girl. If the defect originates from TikTok's role as publisher, isn't it going to be swept into the Section 230 immunity? If this court determines that TikTok was, in fact, simply publishing the content of another than under Barnes, that would fall under Section 230. But as Justice Thomas noted in the statement respecting the denial of certiorari in Malwarebytes, to call this conduct publishing strains the English language. Well, Justice Thomas, incredibly thoughtful, incredibly thoughtful piece in Malwarebytes, right? But before Malwarebytes, that's one justice, but before Malwarebytes we had the Green case in this circuit, and it says that we look to, it adopts a four-circuit test and says that we're looking at publisher under the understanding of the traditional editorial functions. And that seems to include whether to publish, withdraw, postpone, or alter content. And so it seems to me that in order for you to prevail, you need to establish that TikTok is doing something outside of their traditional editorial functions, if you think that that statement in the case I'm calling Green is a holding as opposed to dicta. And the holding in Green, Your Honor, which this circuit's addressing of Section 230 in Green and then the Bodo or Beto case were both quintessential defamation-type actions where plaintiffs were claiming content should be taken down. This is very different here. The definition of the word published, TikTok cites it in their briefs, the definition of to make available to the public. In Barnes, the Ninth Circuit used a slightly different definition of to make available for public consumption. The key is it has to be available to the masses. That's what public means. You're making it available to the masses. But in this instance, though, isn't the way this algorithm operates, as we take from the description of the complaint, that it takes content posted by third parties and disseminates it to other users based on user input? Isn't that an act of dissemination, which is what publishing is? I agree it's an act of dissemination, but it's a targeted message. It's a targeted dissemination to an individual. But it's based on the user's action, not TikTok's action. TikTok has a logic program, but it's the user data that causes it to get to the recipient. There's a difference between user control, as Section 230 requires, and simply utilizing user information. The information TikTok utilizes to determine what goes on one user's For You page versus another user's For You page is not information the user controls. It's things like your age, your race. But it's all information that comes from the user as opposed to comes from TikTok. It's neutral information that's provided. I disagree that it's neutral, Your Honor. Let me withdraw that, then. It is information that is provided by the user that TikTok doesn't control what is the input. And, again, I disagree that it's provided. The user doesn't tell TikTok the user's race or age or where they live. TikTok acquires that information by the camera feature looking at your face. Is that a complaint? Yes, Your Honor. By the geotechnology location features determining where you live. You use the word just so I know what's in the pleading. The geolocation feature is what you're saying is captured by TikTok about the user, correct? Yes. TikTok captures demographic information, including from the camera that literally looks at your face and determines that I'm a white male between the ages of 30 and 50. TikTok determines where you live based on geolocation features. TikTok analyzes content on the phone, other app usage, so that it can determine what content they can send you that will keep you most engaged. On the For You page, and I want to make an important distinction on the technology of TikTok. TikTok has other aspects that we do not challenge. A user creates a profile, and that user posts videos on their profile. And if another user goes on to that user's profile to see their videos, I would agree. That's just information that TikTok is making available to the public who chooses to see it. But the For You page is very different because it is highly customized. It is highly specific. If there are a billion users, there's a billion different For You pages at any given moment in time. So Section 230 liability or immunity we typically think of is immunizing from the statements publisher from the statements of third parties. Are you saying that the For You page is not a third party statement somehow, but is instead a first party statement by TikTok? In part, yes, Your Honor. So the For You page, first of all, fundamentally is not publishing because it is not for public consumption. It is, as the name says, For You, specifically targeted. Second, Your Honor, yes, and this gets to the third element of Barnes. It also gets to Section 230F of the statute, which addresses the content being posted by another. The For You page is when content is put on your For You page, it has a very clear message. The message is not just like when the New York Times places something above the fold and says this is important. The message is this has been selected for you. We have pulled this for you. So it strikes me that this is interesting because every publisher, and I think we're still into the traditional editorial functions, has to engage in some prioritization of content above the fold. If you get 50 editorials, if you're the New York Times, you're probably only going to publish a handful of those each day. You're making recommendations. You're doing an editorial function. You're calling. And so is TikTok doing anything so much different than just calling, which seems to me to be maybe in the heartland of a traditional editorial function? They are, Your Honor, because first, when the New York Times decided which editorials to publish, they're making them available to the public. The New York Times is not saying that you user, based upon what you've read before, what your race or gender is, where you live, we're sending these specific ones to you. That's not traditional publishing. Let me give you a different – staying with the New York Times for a second. The Sunday edition of the New York Times up in the northern part of this area used to have a section called the New Jersey section, and it would go to folks who lived in New Jersey. It didn't go to the people in Westchester, Connecticut, even northern Pennsylvania, only the New Jersey people. Isn't that the analogy? And if so, that's a publishing function of the sort that my colleague is describing to you, is it? And that still is being made available for public consumption. I can't find what's on another user's For You page. It's not made available for public consumption. It's a targeted message to a user. But the content is available for everyone. Whoever is accessible to the app could find that content so that it's publicly available information. Yes, Your Honor. And they're just acting like the New York Times example that my colleague discussed and populating the pages based upon the interest of the consuming public. As I said at the beginning, Your Honor, our claim is not that TikTok bears responsibility merely because this exists and is accessible or available on their platform. It's that act of putting it on the For You page of eTed. That strikes me as when it all boils down, you're basically saying it's not third-party content. It's first-party content. We made a decision. We told you it was For You. That's our speech. That's our message. Even if you have the video here, we've given you something affirmative. I mean, that strikes me if you have a pathway to victory is maybe something worth exploring because everything else seems to fit into what newspapers do. I think the customization and individual nature of it really takes it under both prongs two and three of Barnes. And I know Your Honor's position as to prong three being where it perhaps more appropriately applies. And I want to talk a little bit about the technology that TikTok uses with regard to that. It's not just that this carries the message, this has been selected for you. You will like this. You should read it. TikTok also determines how they will convey it within the context of the other message, the messages within your For You page. Now, in our complaint, this wasn't one singular video that was sent on one occasion. This was TikTok consistently sending dangerous challenges to an impressionable 10-year-old, sending multiple versions of this blackout challenge, which led her to believe this was cool and this would be fun. The way that TikTok chooses not just the video you're seeing now, they choose what comes before it. They choose what comes after. The only way to look at the 50th video on a user's For You page is to make it through the first 49. That sets the narrative and that carries a message with it. And so, Your Honors, we believe this falls under both prongs two and three of Barnes that they do not comply with in this case. I see my red lights on. I'm going to see if Judge Mady has some questions for you and we'll see if we have any other from the panel. Are you still seeking, are you still pursuing a theory of liability for the knowledgeable distributor that arguably TikTok receives information that tells them that there's something here and that as it is actionable and as a distributor, they don't act upon that? Is that still part of your complaint? Yes, Your Honor. And if I can clarify how, and this also gets to part of what Justice Thomas mentioned in Malware Bites regarding a distributor being different than a publisher. It was also the focus of the amicus brief filed before the Supreme Court by members of the United States Senate in Gonzales. And when TikTok's algorithm determines, as they say, that this content is likely to be of interest to a particular individual, that necessarily presumes that the algorithm has developed knowledge of the content. And at that point, it is no different than me determining that I think this violent challenge is appropriate for a 10-year-old and sending it to them with knowledge of it. So yes, that is an aspect of this, is not publisher, they're not a publisher, they're a sender. TikTok, just because they do it through an algorithm and an app, doesn't mean they're any different than an individual who gets this video and forwards it to a 10-year-old. That's actually the precise example we gave in our lower court brief of if a TikTok employee were to send this to a 10-year-old and say, try this, this is cool. That would not be entitled to 230 immunity, and simply because they act through algorithms does not entitle them to 230 immunity. And if they passively pass along the material, the electronic information, and they have no knowledge of its substance, they have no knowledge that it could be particularly problematic or the subject of tortious liability. But then they later come into knowledge that would suggest those things. At that point, if they choose not to act, what happens? I'm not suggesting that TikTok has any obligation ever to take the content down. I recognize Section 230 would acknowledge that to be a publisher function of taking it down. And so, Your Honor, to the extent that it remains in existence with them knowing it's dangerous, although they may have a moral obligation, I'm not suggesting a legal one in that context. However, the legal obligation is to not send it on the For You page. That For You page is no different than sending it in a text message. That is where the obligation is triggered, Your Honor. What about the failure to warn? What is your theory on the failure to warn? It kind of dovetails off of what Judge Mady was asking. If TikTok learned from a source other than having reviewed its content, you're imputing knowledge to them that they know all the content, but assume that weren't the case, and they learn from other sources, other lawsuits potentially. You allege this tragic event happened to three or four other families. They had knowledge of this from an outside source. Is that the basis upon which you believe there's a duty to warn? Or if there is a duty to warn, let me put it this way, if there is a duty to warn, that's not immunized, as compared to the first example that Judge Mady shared, which is they're looking actively at all of the content, see something dangerous, and don't act. I'm trying to get the theory, your theory of failure to warn, because one is a little more supported by Internet brands and one is not. Yes. So, Your Honor, as the court in Internet brands was clear that a failure to warn exists independent of a publisher function. You can add a warning without modifying content. In this case, plaintiffs pled a failure to warn theory under Pennsylvania product liability law, which, and we were at the pleading stage at the time of dismissal, of course, so the nuances didn't get fully fleshed out. But the failure to warn here is broad. And also with failure to warn, as alleged in the complaint, is lack of parental controls. Both theories, which, by the way, were not just allowed in Internet brands, but have more recently been allowed to continue in the MDL that is proceeding in California. And the failure to warn involves when a user downloads the app and creates it in the first place. What warnings are they given about what contents will come before them and how it will exist? When they log into the app, what warnings will be given about what will come to them? And with a specific video, what warnings are provided when TikTok has determined that this video, for whatever reason, is likely to be of interest to her, of this child, and therefore made a determination based on its content, what duty exists to add a warning? And there is a duty which is distinct from any publisher function. So I just want to make sure that I understand, because Internet brands would support the concept, I think, if they learn it not from their own monitoring of content, but from some other outside source, that there's dangerous content. Internet brand seems to suggest a failure to warn could survive the immunity challenge because it's not the act of a publisher. But that if it imposed upon the Internet service provider or the content provider an obligation to look and see, that's where the problem arises under the immunity. So I want to make sure that I know, are you pursuing both theories or are you pursuing one? Because one might be immunized, maybe one won't. I don't know, but I'd like to hear whether you're drawing that distinction. Yes, Your Honor. As Your Honor pointed out in our complaint, we did plead the knowledge of TikTok on a broad basis, based on it's all over the news, there's other reports of it, there's other lawsuits related to it, that the idea of violent and dangerous challenges and even the idea of this specific challenge being dangerous is information TikTok specifically had outside of its behavior related to any content on its platform that therefore triggered an obligation to warn. Okay, thank you. Let me just see if my colleagues have any other questions. Mr. Phipps, maybe? Great, we'll have you back on rebuttal. Thank you, Your Honor. Thanks. Good morning, Your Honor. May it please the Court. Andrew Pincus for Defendant's Appellants. I'd like to, based on the Court's questions, it seems as if there are sort of four issues that the Court has posed, and maybe I can work through them. One is the failure to warn issue, one is the distribution issue, one is the for you is this first party speech issue, and one is the algorithm based on user information issue. So maybe starting... ...those more specific points? Sure. I think C1 says that no provider of an interactive computer service, I think it's clear TikTok meets that category, shall be treated as the publisher or speaker of any information provided by another information content provider. So here... Do you see the publisher-distributor distinction in there? No, we don't, Your Honor. How does distributor get subsumed under the either 1996 definition of publisher or the common law definition of publisher? Well, I think as Judge Wilkinson explained in his decision for the Fourth Circuit in Xeron, at the time that Congress was writing in 1996, distributor liability was basically a subset. That's basically letting Prosser and Keaton dictate what the statute means. Well, I think the question is what did Congress mean when it was using the term publisher? And I think there's an argument... The inference is that Congress, when it used the term publisher, went one for one with Prosser and Keaton? Well, I don't know that it's necessarily Prosser and Keaton. Was Prosser and Keaton what motivated the statute, I think Judge Phipps is asking, or was it Prodigy and Compenser? Well, I think it was a number of things that motivated the statute. It was the services that were in existence at the time. It was the services that were in existence at the time, but Congress was also looking forward to what would develop. Counsel, I don't want to talk about that. Obviously, there were services in line. Was it the two cases? I think the two cases were one of the factors. Stratton was certainly a factor. But I think as a number, Judge Wilkinson addresses this issue as well, as does the Ninth Circuit in Barnes. One of the – it was one factor, but Congress wrote broadly. It did not focus narrowly on the facts of those cases. It wrote broadly, and I think the policy – What they came up with, though, is intriguingly close to the outcomes in those two cases, right? I mean, C-1 seems to nicely deal with the issue in Compenser. C-2 nicely deals with the issue in Prodigy. I mean, so is that just coincidence, or do you think that context is helpful to our understanding? I think it was clearly what was motivating, but I think the use of those terms, publisher or speaker, are broader. I think if you look at what the Supreme Court in the First Amendment context has talked about, what speech is in the third-party content in cases like Hurley and Miami Herald and the cable television case, the court has talked about the fact that organizing third-party content and presenting it is speech. So I think it's clear that the word speaker has a broader meaning. I think at the time, publisher had a broader meaning as well. I don't think it's just Prosser. I think the cases, even the early cases, indicate that distributor liability was really a subset, a more protected category of publisher liability. Your friend on the other side was directing this to Justice Thomas in Malware Bites, and he totally disagrees with everything you just said. He does disagree with that, but I think the other side has the better of the argument, and I think the lower courts that have looked at it. And so, I mean, it strikes me that one of your opponents' best arguments, strongest argument, seems to be just, look, all those early kind of first-gen Internet cases were failure-to-police sorts of cases. You know, I got a punter. You said something defamatory in a chat room. And it seems that they're arguing, look, no, we have a difference in degree or maybe even a difference in kind when it comes to recommending algorithms. And at one level, as I heard their argument, they kind of make two points. One, recommending algorithms are outside the traditional editorial functions, and two, recommending algorithms are first-person speech, not third-person speech. I assume you disagree with both those, but I'd like to hear why. I do disagree with both of those. And just to finish the discussion on Malwarebytes, I think the policy determinations that Congress made and included in the text of the statute are relevant in determining the scope of publishing and speaking. And those policy determinations talk about continued development of the Internet and these services and preserving a free market on federal regulations. Well, there's five. There's five in there. And the Fourth Circuit, Judge Wilkinson, really fixates on those two. But there's others, including preserving a role for parents and providing access or controlled access to their children. I think that's a really strong point in the statute. And it might be Purpose 4. You probably know it better than I do. But it's one of those. And so if we're going to play purposivism based on what's in the statute, we probably need to look at all of the purposes, recognizing that sometimes purposes can be intention, and when they are we might not give full support to the ones that the Fourth Circuit gave. I think that's right, Your Honor, although I think those latter purposes have a lot more to do with C2 than C1. But let me turn to Your Honor's questions about algorithms. I think just taking first the question about whether an algorithm based on user information is somehow different than other kinds of recommendations, I think as Judge Schwartz's example shows. First of all, just taking publishing in the physical world, everything that publishers choose to put into their product, third-party content, is based on a sorting process. The question here is whether, because that sorting process is made more individualized by the technology, it somehow changes. It's based on an understanding of how publishing works. And I think the answer to that is provided in the statute itself, as we talk about in our brief in F4, where Congress specifically included in the protected category of interactive computer services the kind of organizing, reorganizing, picking, and choosing content as something that was protected. So let me just put it this way. The video did not lead in with Nyla Anderson, this is for you. That was not in the video. But the message, Nyla Anderson, this is for you, was delivered to Nyla Anderson. What you seem to be saying is we should treat those two situations identically. If the video would have said, Nyla Anderson, this is for you, section 230 immunity. If the video doesn't say that, but TikTok puts it on the for you page for Nyla Anderson, then that is as if, under your theory, the video said it. I think that's right, Your Honor, for a couple of reasons. And let me start with just a procedural point, which is that my friends didn't raise this first-party speech argument in the district court. And so we explained in our brief that we think that it's not presented here. But turning to the merits, I think any time a publisher or a speaker references or puts before a user third-party content, it's recommending. There's certainly an implicit message there of recommendation. We don't think the fact that it was included in a stream or that the stream had for you at the top changes that reality. But if that's the thinking, that there's a message that's being conveyed, that message is being conveyed by TikTok, not by the content. It's being conveyed by every website that necessarily picks the content from the millions or billions of third-party content that it has. And it would render Section 230 meaningless because it would basically say, yes, you're protected. But once you put particular content before the user, no matter how you select it, even if you don't select it based on individualized information, then it has that implicit message. Let's look at the traditional organizational functions. But suppose in addition to judgemental, TikTok sent an email. Dear Niall Anderson, we would like you to take a look at this video. Does 230C1 apply there? I think there might be a question about whether that's part of an interactive computer service. Some courts have said that it is. I think that's a different question. I think if it is, if it is, then I don't. Let's assume it's an interactive computer service. And they send that email. Does it fall within C1 immunity? We would say, yes, it does. That's a harder case than this case. But we would say that it does because it's still performing that publishing function. But I think this case is a much easier case because this is a case. There's almost nothing that an interactive computer service can do, providing the content that would fall outside of C1? I'll ask you, what would fall outside of that? Well, I think C1 is broad. And I think what Congress has done is instructive. You know, I don't, I think if what, if the, certainly if there was a message that said not just this video is for you, but, you know, we think you should do the things that are in this video. You know, try this. Try the acts that are in the video. That might be a different situation. That's not here. But I think Congress wrote broadly. And I think what's happened, and I think it's instructive, is when Congress has determined that C1 is being applied too broadly, what it does is it hasn't modified C1. It has created exceptions. I think E5, the FOSTA exception for sex trafficking, is a perfect example. Congress did not modify C1. It adopted a very targeted exclusion. It said this particular kind of sex trafficking offense is not going to be both criminally, both for the states and for private actions, is not going to be covered. It did not write broadly. What if the algorithm, falling back to Judge Mady's question about what falls within and without C1, what if the algorithm was not just based on user input, but a decision by the Internet computer server as to what message it likes to send? So it decides to, you know, it's feeling bad that the Eagles lost, so we don't want to send any messages about the Eagles because it will upset its fan base, and exercises that decision. But we want to suppress that message about the Eagles. Would that take it out, as opposed to the, my understanding of this particular algorithm, it's all based on user input. There's no, every, all content, it's agnostic to the content. Am I correct about that, the way the algorithm works? No, the algorithm has a number of different ingredients, and just to preview my answer to Your Honor's question, many algorithms have those choices. Algorithms, Microsoft's brief in the Supreme Court in the Gonzalez case really describes in detail a number of websites that it operates. I want to focus on this one. No, I understand, but I think it's important for the court to understand the breadth of the exception that would be created here. News algorithms, for example, frequently prioritize kind of more respected sources of news that are used more widely, and de-emphasize sort of unique, maybe outside the usual spectrum sources of news. That's a choice that's embodied in the algorithm. Algorithms can de-emphasize all kinds of things and emphasize others. Those are the publisher's decisions about what content it wants to select, and those are protected, and I think holding that they're not protected, both for this website, but for a wide variety of websites, and more importantly for search, I think it's important to recognize that search is an algorithmic recommendation, and those recommendations are ordered based on user information and based on other information about what should be prioritized, for example, in all kinds of areas. And so changing, saying that algorithms that have those factors are not protected would basically affect every website on the Internet, and I think makes Section 230 meaningless, because every claimant could then say this was a product defect, the way the algorithm was designed, I'm not quarreling about the third-party speech, I'm quarreling about the algorithm. So I think that's the problem, both with the 4U exception, and also with this exception is that it basically says any time you use an algorithm, which everyone does, you're out of Section 230 immunity, which would be a pretty dramatic change. Well, the dramatic change, of course, is the growth of algorithmic outputs since 1996. I mean, I think we can all probably agree that this technology either didn't exist in the mid-1990s or didn't exist as widely deployed. Now, but, you know, some of your responses to the way the algorithm works makes me wonder if there is, are these fact questions, and if so, why wouldn't we remand this for discovery to understand how the algorithm works, and perhaps that would illuminate some of the contours here. I think they're legislative fact questions, Your Honor. I think they're facts about what Congress was getting at when it talked about publishing. So I think that it's not a record fact question. That's why I reference the amicus briefs that were filed in the Supreme Court, because I think they have important legislative facts about the sort of breadth and consequences here. I was going to ask you about the failure to warn claim. Yes, I want to talk about the failure to warn claim. I think the question here is the one that was posed in Barnes, which is does the duty or the claim arise out of publishing activities, and to the extent it's based on the content, our submission is it does. Internet brands very carefully said, and I point the court to pages 851 and 853 of the court's opinion, specifically says that the claim there had nothing to do at all with the content. Not only was the information learned outside of the sort of content process, but the claim had nothing to do with the content, and that's why the court has said that the failure to warn claim is different. And courts have rejected failure to warn claims when the failure to warn is about the content or about the way the algorithm works to serve content. Those are two very, very different things. But what about in this scenario, the complaint alleges the other episodes of tragic incidents that occurred following the blackout challenge? Let's assume that's the only way TikTok learned about it. From your perspective, are you saying that it would be immunized from having to make a decision as to whether it was going to let someone who turned on the app know there's dangerous content here? How is that a publisher function? Because the claim still arises out of the content or out of the content being served, and so that is the publishing function that's being protected. So all failure to warn claims would fail. So Internet Brands was wrong. No, Internet Brands was not wrong because the failure to warn claim there did not relate to any of the content that was on the website. It related to something different, that there was a stalker that they learned outside the website. And that stalking didn't – the harm that the plaintiffs incurred there, which was being attacked by the stalker, did not have anything to do with the content on the website. And the court emphasizes that and emphasized it later in distinguishing Internet Brands from cases like this one. Let me see if my colleagues have any other questions. I have a little bit of a hypothetical for you. It involves a traditional state law claim. Let's say there's a child. They go to a grown-up, and they say, where's the best park? The grown-up says, just up the road, North Park is awesome. There's a huge sinkhole in North Park. Child goes, falls in the sinkhole, gets injured. Traditionally under state law, North Park would probably have a fair share of liability for that. But some states might recognize that the grown-up who told the child that North Park was a great park would have some exposure. That's a question of state law. That's not necessarily a publisher point of state law, but it strikes me that under your reading of Section 230, you would say, ordinarily, maybe the grown-up that gives that advice to a child might be liable under state law. But when that entity is an Internet content provider, Section 230 immunizes it. Is that right? Providing third-party content, yes. Take the example of search. The child or the adult types into, what's the nearest park to me? Here's my address. The first search item comes up with the park you're on, yes. The search engine would be immunized by Section 230, because that is third-party content. And, again, the consequences of not doing that means potential liability for every search. And what Congress said was, we are writing broadly here. We are broadly preempting state law. We are leaving federal criminal law and some other laws in as a backup. But we are broadly preempting. And, again, what Congress has done, as in the E-5 sex trafficking example, is when it's seen a problem, it has stepped in. It's stepping in here. There's a hearing before the Senate Judiciary Committee on January 31st about this very issue. Can you modify that hypothetical a little bit? Suppose the search is, what's the nearest park to me? And the search returns, you know, 4th and Main. The child goes. But that's not the nearest park. In fact, 4th and Main is 10 miles away. Liability there? No, Your Honor. Okay. So suppose after that someone happens to be walking by the desk of the search engine manager and says, yeah, 4th and Main is nowhere near that. That's 10 miles away. And the operator says, hey, what are you going to do? Liability there? No, Your Honors. Congress wrote broadly. Congress basically said no liability as a publisher. That's really broadly. I mean, that's really, really broadly. I mean, third-party speech, I mean, I'm kind of hearing what you're saying is that the entire Internet is third-party speech. No, I don't think so. There's lots of first-party speech on websites that people are aware of. But the entire Internet available to algorithm providers is once you do an algorithm, any output you give is automatically just third-party speech within Section 230. You can say we have carefully curated of the billions of possible hits for you, we've carefully curated this. This is by far the best. We stand by our recommendation. We're the best rater. You come to us. They say all that. The answer is just ignore those words as if they were never said. Those words mean nothing. All that matters is look ahead, look past all of those words. That content is not first – that first-party content doesn't matter. Just look at third-party. Just look at the content that was eventually provided. That first-party content may matter if there are misrepresentations in it, but that's a different kind of a case. That's not this case. The question is, is there liability from the serving of the third-party content? And for that, our position and the position of all the courts that have addressed the issue thus far, granted there are judges on each side, is that there's protection. Does that change your answer to my question? Because I thought you just said if there was a misrepresentation in there, that's my – that's my – I think in Judge Phipps' example, on the website it said how they were doing things. Well, what about my – That's the website's own – So representation not about the results of the search but about their own process. That was the misrepresentation. I think that could be. I think that's a very different case from this one. There are no allegations about that. That would be a different case. And there's federal criminal liability backup. Congress provided that as the principal backup. I think what Judge Meade was asking is if the person who was in charge of making sure the algorithm worked and was specifically told by a reputable coworker, you're spitting out false information. And he says, so what? Does that mean that 230 applies, even though he knowingly – am I understanding your hypothetical correctly? Yes. I think 230 applies because the liability would still be based on the action of delivering the contents. Can you square that with what I understand to be a little bit of the history of telecommunications law? The way we thought about things like, for instance, telegraphs, telegraphs, was that it's distribution. If you come in and say, please advise my child to meet me at the train station at 4 p.m. today, and I send it off, no liability if it turns out that what I really meant was 4 p.m. tomorrow or 4 p.m. yesterday. But if the person placing that order said, just to confirm, the telegraph you just sent is 4 p.m. today, and the operator looks down and realizes they sent at 2 p.m., there could be liability there because now I'm aware of the misrepresentation. So that takes that out of the immunity for the just passing along the information. Isn't that the way that we regulated things like those kinds of telecommunications actions? Why wouldn't the same apply here? Because I think Congress specifically adopted a different and broader rule because it realized that this technology was different. They used the word publisher and speaker, so as broad as possible. Two terms that are broad themselves, even broader when they're put together. And I think Congress wrote a statute because it specifically wanted to deal with that. Now, in your example, of course, there's an argument there that it's not third-party content because the telegraph company altered the content. If here, if there was an alteration to the third-party content, to the video here or whatever, that would be a very different case. That's not the claim here. That is the argument, I suppose. It's just that you're saying it's not alteration. It's simply organization, right? I'm assuming they're going to come back and say, that's exactly what we're arguing here. Yes, but the content itself wasn't, and organization is itself a publishing function. You can't separate organization from the act of publishing because you have to organize the material, and especially in the world of the Internet that we live in where there are these billions of pieces of third-party content. How are they going to be navigated? This is one way. If there's, if my friend is right and you're liable for every piece of third-party content, you can be alleged that your algorithm was a defective product. That means in every case you get over to Section 230 immunity, and you get into maybe motion to dismiss, maybe discovery, maybe trial. So the burdens shift dramatically. But at what level, like, is that surprising? I mean, when Section 230 was passed, we had two cases. We had CompuServe and we had Prodigy. Both of those were failure-to-police, basically, cases. Those weren't algorithmic recommendation cases. And so I don't think there's really any dispute about how Section 230c1 solves failure-to-police cases. We're here because, and I think it's a fair reading, at least to the extent you credit legislative history, that Congress wanted to read, wanted to have Section 230c1 be a little broader than failure-to-police cases. But I also think that was the prompt. And so there might be no dispute that failure-to-police cases are in that heartland of Section 230c1. But recommendation algorithms, you seem to be saying that the sky is falling because everyone would be liable for that. If the statute is read in a way that the sky does fall, that's not on us to correct. That's on Congress to correct. And if we read it that way and we said, hey, the statute actually doesn't speak to algorithmic liability. You mentioned that there's hearings coming up in Congress. I think they'd be pretty prompt to respond to something like that, to say, aha, in 1996 we had no idea how ubiquitous algorithms would be. Now we do. To the extent that we want to navigate that, we can amend this. But to take a 1996 law and say, yes, it must be stretched to fit algorithmic liability because otherwise the sky falls seems to be asking a lot of the judiciary, no? I don't think so, Your Honor. I think as Judge Schwartz pointed out, even in the physical world, physical publishers made choices and had user-focused different distributions. My grandparents grew up on Long Island. There was a Long Island edition of the New York Times. So I think the idea that publishers not only selected content and decided how to display it, but targeted different audiences with different content exists in the physical world. We use in the brief the example of a magazine publishing company that has a dozen titles. It's deciding what articles go where based on the audience for those publications. So the idea of selecting third-party content and making it differ between audiences, true in the physical world. So the question here is, yes, it is much more individualized, but is that a difference in kind? We would submit no. And to the extent it's a difference in kind, it's a difference that Congress specifically foreshadowed and indicated it wanted to protect by citing the tools that do that in F4. In addition to, and I know Your Honor disagrees, saying we want this interactive computer service world to continue to develop. Congress wasn't freezing technology at the point that it was in 1996. It was looking forward to the promise of the Internet and wanting that technology to develop. So I think that's the answer to Your Honor's question is that's why Congress wrote broadly. If it had only wanted to target leaving things up, the perfect compliment to C2 would have said, and you're not liable if you leave things up. But they wrote much more broadly, and publishing and speaking has a broader meaning. Publishing includes this idea of selecting content and prioritizing content for different audiences, and that's what these websites are doing. So if we tether our analysis to the text, your argument is Congress immunized acts involving publishing. Recommendation algorithms are acts of publishing because they disseminate information, albeit super fast and very targeted. It is nonetheless an act of publishing, and that's what Congress's language, textual message was to all of us. Is that your argument? Exactly, Your Honor, and that F4 specifically calls out those tools, and that to the extent there is an implicit message in that act of publishing, that's part of publishing, too, and so you can't carve off that implicit message and say, oh, no, that's first-party speech. Because then you're basically saying all publishing that involves the selection of content has first-party speech. And there would be a First Amendment argument about even if that 230 didn't apply, there would be a First Amendment argument about that first-party speech would be protected speech, the 11th Circuit. That's true for implicit speech. I think that's got to be true, I think, for implicit speech. But when it crosses the line and becomes explicit is where this gets to me difficult. I think the idea that the New York Times selection of opinion and letters to the editor doesn't say these are the letters to the editor we think you would be the most interested in, that message is there. Even if it said that. Yes, it is. I'm just saying that I don't think there's a difference between those two things. So does F4 really do any work here? Because it sounds like your argument is publication includes all of the acts that a provider of, in this case, electronic information takes. So we can look through, organize, it doesn't matter. Because even if they sent daily emails saying, NILA, we can't tell you how great this is, this is fantastic, you need to stop everything and watch this. Right now it's amazing. You would still say, yeah, that's publication. I think sort of footnoting our discussion about emails. Yes, I think that F4 does work. Because I think to the extent the argument on the other side is the technology makes it different. I think what Congress was saying was, no, we want to actually protect the evolution of this particular kind of technology. And so I think F4 responds to the argument that because it can be done in a much more user-specific way, that somehow changes it from something that publishers do into something else. I think F4 undermines that argument. Do you have any further questions, Judge Mady? No. If I can just add one last comment about the distribution question. I think the other reason that doesn't fit here is the publishing and the distribution really happen pretty simultaneously in this situation. There really isn't a distinction between when this information is sort of made available and when it's made available in a 4U column. So I think they merge in the Internet context, not always, but to a very significant degree. So I think that's another reason why that distinction, Congress wouldn't have thought that distinction made sense here. Well, right, but the merger you're talking about is part of the broader arrival of convergence in technology generally. And so, yes, if Congress had all of this in its – if Congress's intent here or Congress's point can be found in a word called publish and publish includes all of those forward-thinking ideas, then sure. But it still seems like your argument about Congress wanting to preserve flexibility for the growth of technology, I'm not sure I understand how that fits within the kinds of conduct that could have been available previously but simply weren't taken. New York Times could have gone out of its way to create individual ways of distributing its newspaper to houses. It just didn't because it wasn't cost effective. I think because – I think that the reason that technology is important is that it overcomes the cost barrier. But that's the technological point. But the New York Times could have also always said, here is the best letter to the editor today. Right? But it didn't. It just presented it neutrally. So that's not a change in technology. That's a change in the way that you're presenting the information, isn't it? I don't think so, Your Honor. I think when I opened up that paper when I was in high school, the first letter to the editor I thought was the one that they wanted me to read first, just like the op-ed at the top of the op-ed page was the one that was getting the most prominence. That's the one they thought was going to be the most interesting and the most salient. And the things that were down at the bottom of the page were less salient, just like the above-the-fold, below-the-fold distinction on the first page. I think the other thing I'd say is, yes, the technology has developed. But in the Fourth Opinion, the Second Circuit's opinion, on pages 66 and 67, there's a discussion of what the technology was. There's another of the Gonzales-Amicus briefs, the one that we cite, followed by the Center for Democracy and Technology, on pages 12 and 13, talks about what the technology was. It was nascent, but there was prioritization even then. Thank you. Counsel? Thank you, nurse. To get to a point that Judge Phipps had mentioned, the distinction between implicit and explicit communication communicated through the app. There's nothing implicit about the message that TikTok communicates. Literally, the words, for you, appear at the top of the news feed with TikTok conveying a deliberate message that this content has been specifically curated for you. I agree with Your Honor that failure to police cases do fall within the heartland of Section 230, and this is specifically not a failure to police case. This is not a case where it was just obtained via the search function. We're not trying to eradicate the ability to use a search function. This is a case where it was sent for you. One point that I absolutely would like to address is, counsel for TikTok had mentioned that somehow we waived this argument in the lower court briefing. At page 11 of our brief, A127 of this record, we state, quote, this is the lower court briefing, Had a TikTok employee, in an effort to carry out his official job responsibilities, spied on 10-year-old Nyla and then used the information gained to determine that Nyla was likely to view and partake in dangerous challenges involving choking activity, and texted a blackout challenge video link to her and said, quote, try this. No one would suggest the CDA bestows immunity. That is precisely what TikTok did, and simply because TikTok utilized sophisticated, automated, and effective technologies to accomplish this action, does not bring plaintiff's claims under the CDA. We raised it crystal clear, just like we did today. Now, much of the questioning focused on the use of algorithms. Algorithms that were in their infant stages in 1996. But importantly, we don't have to create, like TikTok has asked, a but-for analysis. That if an algorithm is involved, we completely scrap it. Or that just because content is in some way involved, they automatically get immunity. That type of but-for analysis was rejected time and time again by courts, especially in Barnes and Internet brands. Because if it was applied, there would never be any liability for any Internet service provider. But I want to look at the text of the statute, because 230C1 is different than 230C2. C2 specifically says they shall not be held liable for essentially good-faith policing efforts. C1 does not provide that same type of but-for exclusion. It merely says they shall not be treated as a publisher. And in this case, we're not treating them as a publisher. With regard to the use of algorithms, the statute itself speaks to the purpose, maximizing user control. And here, there may be algorithms that help maximize user control, like when Uber Eats shows me restaurants in my area, because they're the only ones that are going to deliver to me anyway. TikTok doesn't work that way. The user can't control what video they see first, what video they see next. Instead, the algorithm bases it on, as Your Honor indicated, a variety of factors outside of that. The Eagles example, it may prioritize content on a Sunday because it knows you're more likely to be interested. That's not a user input. The algorithm does make decisions, and we've had no discovery into exactly how those decisions work, which respectfully, we should have been provided the opportunity to do so in this case. I thank Your Honor for your time and ask if there's any other questions before I conclude. Thank you, counsel. Thank you. We thank counsel for both sides for the very helpful briefing and argument.